# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | | |
|---|---|---|
| ANTWION DOWDY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 2:20-cv-02874-SHL-atc |
| | ) | |
| VINCE VANTELL, | ) | |
| | ) | |
| Respondent. | ) | |

---

**ORDER MODIFYING THE DOCKET, DENYING PETITION PURSUANT TO
28 U.S.C. § 2254, DENYING A CERTIFICATE OF APPEALABILITY, CERTIFYING
THAT AN APPEAL WOULD NOT BE TAKEN IN GOOD FAITH, AND DENYING
LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

---

Before the Court are the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody ("§ 2254 Petition"), filed by Petitioner Antwion Dowdy, Tennessee Department of Correction prisoner number 556395, an inmate at the Trousdale Turner Correctional Center ("TTCC") in Hartsville, Tennessee (ECF No. 1); the Answer to Petition for Writ of Habeas Corpus ("Answer"), filed by Respondent Raymond Byrd (ECF No. 9);[1] Dowdy's Reply to the Respondent's Answer to Petition for Writ of Habeas Corpus ("Reply") (ECF No. 11); and Petitioner's Supplemental Reply to Respondent's Answer to Petition for Writ of Habeas Corpus ("Supplemental Reply") (ECF No. 14).   For the reasons stated below, the Court **DENIES** the § 2254 Petition.

---

[1] The Clerk is directed to modify the docket to substitute current TTCC Warden Vince Vantell for Byrd as Respondent.   Fed. R. Civ. P. 25(d).

## I.      BACKGROUND

### A.      State Court Procedural History

On February 10, 2015, a grand jury in Shelby County, Tennessee returned a six-count indictment against Dowdy.   (ECF No. 7-1 at PageID 61–67.)   Count 1 charged Dowdy with the first degree murder of Sharquette Smith.   (*Id.* at PageID 61.)   Counts 2 through 5 charged Dowdy with aggravated assault through the use or display of a deadly weapon against Jacques Wright (Count 2), Jamie Foster (Count 3), Kelia Johnson (Count 4), and Edward Grandberry (Count 5). (*Id.* at PageID 62–65.)   Count 6 charged Dowdy with employing a firearm during the murder of Smith.   (*Id.* at PageID 66.)

A jury trial began in Shelby County Criminal Court on September 15, 2015.   (*Id.* at PageID 90.)   Three days later, the jury returned guilty verdicts on all counts of the indictment. (*Id.* at PageID 93; ECF No. 7-7 at PageID 822–25.)   That same day, the trial judge sentenced Dowdy to life imprisonment with the possibility of parole for the murder (ECF No. 7-7 at PageID 825), and a judgment on Count 1 was entered.   (ECF No. 7-1 at PageID 110.)   After a separate sentencing hearing on the remaining counts, judgments were entered on November 13, 2015, with Dowdy being sentenced as a Range I standard offender to concurrent terms of five years on Counts 2 through 5.   (*Id.* at PageID 111–14.)[2]   The Tennessee Court of Criminal Appeals ("TCCA") affirmed.   *State v. Dowdy*, No. W2015-02342-CCA-R3-CD, 2016 WL 7654950, at *14 (Tenn. Crim. App. Sept. 21, 2016) ("*Dowdy I*"), *appeal denied* (Tenn. Dec. 15, 2016) (ECF No. 7-13).

On July 25, 2017, Dowdy filed a *pro se* Petition for Post-Conviction Relief and a supporting memorandum in the Shelby County Criminal Court.   (ECF No. 7-14 at PageID 937–41, 945–54.)   After counsel was appointed to represent Dowdy (*id.* at PageID 956), an Amended

---

[2]  Count 6 was dismissed at sentencing.   (*Id.* at PageID 115.)

2

Petition for Post-Conviction Relief was filed on July 20, 2018 (*id.* at PageID 962–76.)   The State responded on September 7, 2018.   (*Id.* at PageID 977–78).   A hearing on the post-conviction petition was held on December 7, 2018.   (*Id.* at PageID 980–1011.)   The TCCA later affirmed. *Dowdy v. State*, No. W2019-00398-CCA-R3-PC, 2020 WL 864168, at *9 (Tenn. Crim. App. Feb. 19, 2020) ("*Dowdy II*").

The events at issue occurred on May 18, 2013, during a high school graduation party attended by members of two rival gangs.   *Dowdy I*, 2016 WL 7654950 at *1–3.   Smith, who was fifteen years old and intoxicated, was seen arguing with some men, including Dowdy.   *Id.* at *2. Wright, Foster, Johnson, and Grandberry attempted to drive away but had to turn around when they reached a dead end.   *Id.*   Smith got into the car and shouted at people and displayed gang signs as they were leaving.   *Id.*   Dowdy, and perhaps others, shot at the car, striking Smith. Johnson drove to the hospital and waited for the police.   *Id.* at *3.

Dowdy gave a statement to the police in which he admitted that he was responsible for Smith's death and that he fired two rounds from a black automatic handgun while standing in the street.   *Id.* at *5.   According to Dowdy, two other individuals also fired at the car.   *Id.*   Dowdy claimed that Smith also fired a weapon.   *Id.*   At trial, however, Dowdy testified that he was at the party but did not possess or fire a weapon.   *Id.* at *11.   He testified that he told the police that he heard gunshots but was unaware that anyone had been shot.   *Id.*   He also claimed that he did not change his story and that he believed his statement was just release paperwork.   *Id.*

### B.   Dowdy's § 2254 Petition

On December 1, 2020, Dowdy filed his *pro se* § 2254 Petition, accompanied by a legal memorandum.   (ECF Nos. 1, 1-1.)   The § 2254 Petition presents the following claims:

1.   "Ineffective assistance of counsel" (ECF No. 1 at PageID 5; *see also* ECF No. 1-1 at PageID 16–27);

3

2.     "Conviction was based on a coerced confession" (ECF No. 1 at PageID 6; *see also* ECF No. 1-1 at PageID 16–17);

3.     "Conviction was based on a violation of the privilege against self-incrimination" (ECF No. 1 at PageID 8; *see also* ECF No. 1-1 at PageID 16–17); and

4.     "Other grounds" (ECF No. 1 at PageID 10; *see also* ECF No. 1-1 at PageID 22–27).

On December 22, 2020, the Court directed the Warden to file the state court record and a response to the § 2254 Petition.  (ECF No. 6.)   The Warden filed the record and his Answer on January 14, 2021.  (ECF Nos. 7, 9.)   Dowdy filed his Reply on March 16, 2021.  (ECF No. 11.)[3]

On May 23, 2023, an attorney filed a Notice of Appearance on Dowdy's behalf.  (ECF No. 13.)   On September 21, 2023, Dowdy filed his Supplemental Reply.  (ECF No. 14.)[4]

## II.   ANALYSIS

### A.    Challenges to Dowdy's Confession (Claims 2 & 3)[5]

In Claim 2, Dowdy argues that his conviction was based on a coerced confession.  (ECF Nos. 1 at PageID 6, 1-1 at PageID 16–17.)   In Claim 3, Dowdy argues that his conviction was based on a violation of his privilege against self-incrimination.  (ECF No. 1 at PageID 8.)   The factual basis for Claim 3 is not presented.   The Warden argues that Claims 2 and 3 were not properly exhausted in state court and that they are barred by procedural default.  (ECF No. 9 at PageID 1314–15.)   The Court agrees, although for slightly different reasons than those advanced by the Warden.

---

[3] This filing is unsigned, in violation of Rule 11(a) of the Federal Rules of Civil Procedure. Another version of the Reply, in which only the certificate of service is signed, was docketed on March 17, 2021.  (ECF No. 12.)   The Court has exercised its discretion to consider Dowdy's late-filed Reply and to disregard the absence of a signature.

[4] Although counsel failed to seek leave to file his Supplemental Reply, the Court will exercise its discretion to consider it.

[5] In the interest of clarity, the Court will address Claim 1 last.

A federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal habeas petition to the state courts pursuant to 28 U.S.C. §§ 2254(b) and (c).   *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).   The petitioner must "fairly present" each claim to each appropriate state court.   *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). If a claim has never been presented to the state courts but a state court remedy is no longer available (*e.g.*, when an applicable statute of limitations bars a claim), the claim is technically exhausted, but procedurally barred.   *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991).   To avoid procedural default, a habeas petitioner in Tennessee must present his federal claims to the trial court and, on appeal, to the TCCA.   *Covington v. Mills*, 110 F. App'x 663, 665 (6th Cir. 2004).

To fairly present a federal claim, a prisoner must present the same facts and legal theory to the state courts as is raised in his federal habeas petition.   *See Anderson v. Harless*, 459 U.S. 4, 6–7 (1982); *Picard v. Connor*, 404 U.S. 270, 276–77 (1971); *Hodges v. Colson*, 727 F.3d 517, 529 (6th Cir. 2013) ("The exhaustion doctrine requires the petitioner to present the same claim under the same theory to the state courts before raising it on federal habeas review.") (internal quotation marks and alteration omitted).   "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson*, 459 U.S. at 6 (citation omitted).   In evaluating whether a prisoner has "fairly presented" a claim to a state appellate court, the controlling document is the inmate's brief.   *See Baldwin*, 541 U.S. at 32 ("[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so.")

Although Dowdy exhausted a claim that his counsel was ineffective in failing to file a motion to suppress, he failed to exhaust the standalone versions of the claims. Claims 2 and 3 were included in Dowdy's post-conviction petition. (ECF No. 7-14 at PageID 939.) However, the claims were included in the amended post-conviction petition only as ineffective assistance of counsel. (*See id.* at PageID 965; *see also id.* at PageID 975 (incorporating some, but not all, claims from original post-conviction petition). The post-conviction court addressed only counsel's failure to file a motion to suppress. (*Id.* at PageID 1006–07.) Dowdy failed to raise Claims 2 and 3 as standalone issues in his brief to the TCCA on the post-conviction appeal. (*See* ECF No. 7-17 at PageID 1207.) He has, therefore, failed to properly exhaust these claims in state court. Because there is no other means of doing so, Claims 2 and 3 are barred by procedural default.[6] Thus, those claims are **DISMISSED**.

### B.     Prosecutorial Misconduct (Claim 4)

Claim 4 is titled "Other Grounds," followed by a general reference to the legal memorandum. (ECF No. 1 at PageID 10.) The Warden argues that Dowdy failed to plead facts in support of this claim. (ECF No. 9 at PageID 1315–16.) However, it appears that Dowdy is asserting a claim of prosecutorial misconduct based on certain remarks during closing arguments. (ECF No. 1-1 at PageID 22–26.) But Dowdy failed to exhaust this claim on direct appeal (ECF No. 7-8 at PageID 832) or the post-conviction appeal (ECF No. 7-17 at PageID 1207, 1209–14). Because there is no longer any avenue for exhausting Claim 4, it is **DISMISSED** as barred by procedural default.

---

[6] The Warden argues the claim was waived under Tenn. Code Ann. § 40-30-106(g).   (ECF No. 9 at PageID 1314–15.)   However, in order for waiver to result in a procedural default, the state court must have actually relied on that ground.   *Barton v. Warden, S. Ohio Corr. Facility*, 786 F.3d 450, 464 (6th Cir. 2015); *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).   Because Claims 2 and 3 were never presented to the state courts, the waiver rule was not applied.

### C.   Ineffective Assistance of Counsel (Claim 1)

In Claim 1, Dowdy argues that his trial counsel was ineffective by (a) failing to file a motion to suppress his statement; (b) failing to adequately challenge the eyewitness identification testimony; (c) failing to request a jury instruction on criminal responsibility; (d) failing to investigate the homeowner of the residence where the party was held; and (e) failing to object to the State's improper closing argument.  (ECF No. 1-1.)  As described below, these sub-claims are either procedurally defaulted or unsuccessful on the merits.

### 1.   Procedurally Defaulted Sub-Claims

The Warden argues that Dowdy failed to properly exhaust sub-claims (b) through (e) in state court and that they are now barred by procedural default.  (ECF No. 9 at PageID 1309–10, 1312–13.)  The Court agrees.[7]  Dowdy did not present sub-claims (b) through (e) to the TCCA on the post-conviction appeal.  (*See* ECF No. 7-17 at PageID 1209–14.)  Dowdy is barred from filing another post-conviction petition because of Tennessee's one-year statute of limitations and its "one petition" rule.  Tenn. Code Ann. §§ 40-30-102(a), (c).  Because there is no longer any means of exhausting sub-claims 1(b) through (e), they are barred by procedural default.

In his Reply, Dowdy argues that his procedural defaults were due to the ineffective assistance of post-conviction counsel.  (ECF No. 11 at PageID 1318–19.)  There is no Sixth Amendment right to counsel in post-conviction proceedings; therefore, an inmate ordinarily cannot obtain relief for the ineffective assistance of counsel in such proceedings.  *Coleman*, 501 U.S. at

---

[7] The Warden also contends that Dowdy did not properly exhaust sub-claim (a) to the extent that he argues that his lawyer failed to adequately interview him to discover the basis for a suppression motion.  (ECF No. 9 at PageID 1306–07.)  And that is true.  Yet, construing this claim liberally, it appears that Dowdy is attempting to assert the claim that he exhausted in state court.  This is confirmed by the Supplemental Reply, which is confined to that claim.  (ECF No. 14.)

752.   However, in *Martinez v. Ryan*, 566 U.S. 1, 17 (2012), the Supreme Court held that a prisoner could overcome his procedural default of a claim of ineffective assistance of trial counsel ("IATC"): "Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance . . . if, in the initial-review collateral proceeding . . . counsel in that proceeding was ineffective."   In Arizona, where *Martinez* arose, IATC claims could not be raised on direct appeal.   In its subsequent decision in *Trevino v. Thaler*, 569 U.S. 413, 429 (2013), the Supreme Court extended its holding in *Martinez* to states in which a "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal . . . ."   The decisions in *Martinez* and *Trevino* apply to Tennessee prisoners.   *Sutton v. Carpenter*, 745 F.3d 787 (6th Cir. 2014).

To obtain relief on a *Martinez* claim, a habeas petitioner must show that:

(1) the claim of ineffective assistance of trial counsel was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino*, 569 U.S. at 423.   The Sixth Circuit Court of Appeals applies the following standard to assess a *Martinez* claim:

[T]he district court should determine . . . : (1) whether state post-conviction counsel was ineffective; and (2) whether [Petitioner's] claims of ineffective assistance of counsel were "substantial" within the meaning of *Martinez*, *Sutton*, and *Trevino*. Questions (1) and (2) determine if there is cause.   The next question is (3) whether [Petitioner] can demonstrate prejudice.   Finally, the last step is: (4) if the district court determines that [Petitioner] establishes cause and prejudice as to any of his claims, the district court should evaluate such claims on the merits. . . .

*Atkins v. Holloway*, 792 F.3d 654, 660 (6th Cir. 2015) (citations omitted).

### a.      Sub-claim (b)

Counsel's failure to adequately challenge the eyewitness identification testimony—sub-claim (b)—was not presented to any state court, so *Martinez* is potentially available.  Dowdy alleges that his attorney failed to investigate the eyewitness identification testimony "to determine the date the identification was made, and all persons present" in order to assess whether there was a basis for suppressing their identifications of Dowdy from a photo lineup.  (ECF No. 1-1 at PageID 17–18.)

It is not possible on the present record to assess whether sub-claim (b) is "substantial." Dowdy does not set forth the information he claims could have been discovered by a more thorough investigation.   Without that information, it is not possible to determine that Dowdy was prejudiced.

And it is not possible for this Court to hold an evidentiary hearing to develop the factual basis for sub-claim (b).  Even if it were assumed that Dowdy's post-conviction counsel was negligent in failing to develop the factual record, that error is attributable to Dowdy.  *Shinn v. Ramirez*, 596 U.S. 366, 371 (2022).   Under 28 U.S.C. § 2254(e), a prisoner "has failed to develop the factual basis of a claim" when he is "at fault," meaning that he "bears responsibility for the failure to develop the record."   *Shinn*, 596 U.S. at 382 (internal quotation marks omitted). Because there is no Sixth Amendment right to counsel in state post-conviction proceedings, "counsel's ineffective assistance in developing the record is attributable to the prisoner."   *Id.*

Sub-claim (b) is **DISMISSED** as barred by procedural default.

### b.      Sub-claim (c)

Sub-claim (c) contends that trial counsel failed to request a jury instruction on criminal responsibility.   (ECF No. 1-1 at PageID 19–21.)   Again, this sub-claim was not presented to the state courts and, therefore, *Martinez* is potentially applicable.   However, as the Warden points

out, the issue is clearly meritless.   (ECF No. 9 at PageID 1310.)   A criminal responsibility jury

instruction is warranted where the jury is asked to find that the defendant or someone for whom

he can be held responsible committed the crime.   Under Tennessee law,

> [a] person is criminally responsible for an offense committed by the conduct of another, if:
>
> (1) Acting with the culpability required for the offense, the person causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense;
>
> (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense; or
>
> (3) Having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the person fails to make a reasonable effort to prevent commission of the offense.

Tenn. Code Ann. § 39-11-402.   Dowdy relies on *State v. Howard*, 30 S.W.3d 271 (Tenn. 2000),

which addressed the jury instructions required to convict a defendant of first degree murder under

an aiding and abetting theory.   In this case, Dowdy was not tried as an aider or abettor; instead,

the jury was required to find that he personally shot Smith.   Therefore, an aiding and abetting

instruction was not required.

Sub-claim (c) is **DISMISSED** as barred by procedural default.

### c.      Sub-claim (d)

Dowdy argues that counsel failed to investigate the owner of the premises where the party

was held.   (ECF No. 1-1 at PageID 21–22.)   He alleges that his attorney should have

"determine[d] what her testimony would be in regard to where she was at the time of the crime,

what she saw, and whether her testimony would be exculpatory since she wasn't present at [sic]

trial, although her statement to the police was apart [sic] of [the] discovery packet."   (*Id.* at PageID

22.)

Although this sub-claim is potentially subject to *Martinez*, it has the same flaws as sub-claim (b).   It is not possible to assess the strength of the sub-claim because counsel was not asked whether he interviewed the homeowner, and the homeowner did not testify at the post-conviction hearing.   The Court also cannot hold an evidentiary hearing to develop the record, as there is no basis to do so.

Sub-claim (d) is **DISMISSED** as barred by procedural default.

### d.  <u>Sub-claim (e)</u>

Sub-claim (e) alleges that counsel failed to object to certain improper statements during the State's closing argument.   (ECF No. 1-1 at PageID 22–27.)   Those statements range from general anger and disgust over "people getting killed, getting murdered over nothing," (ECF No. 1-1 at PageID 23; ECF No. 7-7 at PageID 794), to questionable pleas to the jury not to "let him get away with murder," (ECF No. 1-1 at PageID 24; ECF No. 7-7 at PageID 800), to impugning Dowdy's demeanor on the stand: "I think it was obvious when Mr. Dowdy testified . . . that [there was not] even a shred, even a shred of remorse, even a shred.   On the stand when confronted with a confession [he] just makes up lies."   (ECF No. 1-1 at PageID 24; ECF No. 7-7 at PageID 799.)   However, a claim concerning improper closing arguments was not presented in a post-conviction petition or to the TCCA, and has therefore been procedurally defaulted.

Again, *Martinez* is potentially applicable, but Dowdy cannot establish prejudice even if it were assumed that some or all of the statements were improper.   As the Warden has noted (ECF No. 9 at PageID 1314), multiple witnesses saw Dowdy with a firearm before the shooting.   *Dowdy I*, 2016 WL 7654950, at *1–3.   Jamie Foster, one of the aggravated assault victims, testified that she saw Dowdy retrieve a gun from his truck and point it at her car.   She then heard gunshots. *Id.* at *1–2.   Jacques Wright, another aggravated assault victim, testified that he saw Dowdy with a gun that night.   Wright saw gunfire coming from Dowdy's gun as they drove away.   *Id.* at *3.

Dowdy also gave a statement to police in which he admitted to firing two shots and that he was responsible for Smith's death. *Id.* at *5. That evidence was sufficient for the TCCA to conclude on direct appeal that the evidence was sufficient to uphold Dowdy's conviction. *Id.* at *13. The TCCA noted that, "[a]lthough the defense presented witnesses who provided testimony contradictory to the State's witnesses, any conflicts in the evidence and witness credibility were resolved by the jury in favor of the State." *Id.*

Sub-claim (e) is **DISMISSED** as barred by procedural default.

### 2.    Counsel's Failure to File a Suppression Motion

In sub-claim 1(a), Dowdy complains that his attorney failed to file a motion to suppress his statement. (ECF No. 1-1 at PageID 16–17.) This sub-claim is controlled by the standards in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which require a showing that "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." To establish deficient performance, a person challenging a conviction "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range of reasonable professional assistance." *Id.* at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine

12

confidence in the outcome." *Id.* "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Richter*, 562 U.S. at 104 (internal quotation marks and citation omitted); *see also id.* at 111–12 ("[T]he question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . The likelihood of a different result must be substantial, not just conceivable.") (citations omitted); *Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) ("But *Strickland* does not require the State to 'rule out' [a more favorable outcome] to prevail. Rather, *Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.").

The statement at issue was taken following Dowdy's arrest. At the post-conviction hearing, Sergeant Mundy Quinn testified that he participated in the two-and-a-half-hour interview of Dowdy with Officer Sewell. (ECF No. 7-16 at PageID 1031, 1036, 1047–48.) The interview was suspended at one point while the officers waited for a crime scene officer to arrive, which, Quinn testified, "could have taken an hour." (*Id.* at PageID 1042; *see also id.* at PageID 1045 (the crime scene officers are stationed in another building some distance from the police station).) Quinn testified that the length of the interview was not unusual. (*Id.* at PageID 1046.) After the interview, a typist documented Dowdy's statement at an officer's open cubicle. (*Id.* at PageID 1040–41, 1046.) Approximately one hour and fifteen minutes later, Dowdy signed his statement. (*Id.* at PageID 1036, 1047.) Quinn did not recall Dowdy raising any disagreement with the details of the typed statement. (*Id.* at PageID 1042.) It was Quinn's practice that, if an objection was raised, he would "give [the subject] a pen and they could cross it out and put what they wanted to." (*Id.* at PageID 1043.) Rather than making any corrections, Dowdy initialed each page of the statement. (*Id.* at PageID 1042.)

During the interview, Quinn did not get angry or raise his voice.  (*Id.* at PageID 1039.)

He did not threaten or coerce Dowdy to give his statement.  (*Id.* at PageID 1044.)  Prior to the

questioning, Quinn advised Dowdy of his *Miranda* rights.  (*Id.* at PageID 1045.)  Dowdy did not

ask for a lawyer at any time.  (*Id.* at PageID 1035.)  If he had, Quinn would have stopped the

interview so Dowdy could obtain counsel.  (*Id.* at PageID 1044, 1047.)

Sergeant Lundy, the case coordinator, had identified Dowdy as a suspect prior to the

interview, and Quinn was aware that other witnesses had identified Dowdy as the shooter.  (*Id.* at

PageID 1031.)  Dowdy initially admitted to being at the party but denied that he was involved in

an altercation.  At that point, he was confronted with the fact that witnesses had identified him as

the shooter.  (*Id.* at PageID 1032–33.)  Dowdy denied that he had discharged a firearm.  Crime

scene officers were asked to come to the homicide office "to run the ALS light [alternative light

source] over Mr. Dowdy to see if there was a presence of GSR [gunshot residue]."  (*Id.* at PageID

1032.)  The crime scene officer said that the test was positive.  (*Id.* at PageID 1033.)  Quinn

believed the test results were accurate.  (*Id.* at PageID 1035.)  Dowdy then stated that he had a

gun after the party and had fired it into the air in a field.  (*Id.* at PageID 1033–35.)  Quinn told

Dowdy that he did not believe him, and Dowdy then said, "I want to tell you the truth.   I got into

it with someone and they shot at me and I fired back."  (*Id.* at PageID 1034; *see also id.* at PageID

1035 ("And then he changed his story again, saying that the victim had fired shots at him and he

returned fire.").)  This was Dowdy's third version of events.  (*Id.* at PageID 1035.)  Quinn

testified that it was not unusual for a suspect to change his story when confronted with inconsistent

facts.  (*Id.* at PageID 1044.)

Officer James Sewell testified that he was on the team investigating the homicide.  (*Id.* at

PageID 1049.)  Prior to interviewing Dowdy, Sewell obtained statements from the homeowner

and her son.  (*Id.* at PageID 1049–50.)  Sewell did not become loud with Dowdy.  (*Id.* at PageID

1056–57.)   In response to a question about his interview style, Sewell testified that "I'm not a

yelling, screaming kind of guy."   (*Id.* at PageID 1051.)   The interview "was pretty calm.   It was

nothing loud like that because I was there.   I mean, I didn't get loud.   Sergeant Quinn never got

loud."   (*Id.* at PageID 1057.)   He testified that no coercion or threats were used to induce Dowdy

to confess.   (*Id.* at PageID 1058.)   Sewell recalled that Dowdy's mother was sitting outside the

interview room, and he did not ask to speak to her.   (*Id.* at PageID 1053.)   Dowdy never asked to

speak to a lawyer.   (*Id.* at PageID 1053, 1058.)

Sewell testified that Dowdy's reaction to being confronted with some of the evidence

against him was "a little humorous."   (*Id.* at PageID 1051.)   He explained:

> [H]e had given you know, he had nothing to do with it and wasn't there.   First he
> said I was in the house when it happened.   Then he changed it to well I was outside
> but being held back by the homeowner.   But then when the crime scene officer had
> the goggles first so he could see the results.   And the crime scene officer said uh-
> huh and then he handed them to Sergeant Quinn and he put the [goggles] on and he
> said uh-huh . . . .   I didn't see anything with the naked eye.   And then Sergeant
> Quinn gave me the goggles and it looked like glitter, you know, his hands and his
> face looked like a little teenager girl going partying.   And then I said the same
> thing uh-huh.   And when I said that, you client said Sergeant Sewell, is it too late
> to change my story.   And I said no, it's never too late to change your story.

(*Id.* at PageID 1052; *see also id.* at PageID 1058 ("That's the part that was kind of humorous when

we were saying uh-huh because what we saw and I guess he keyed up on it, he realized he needed

to change his story.").)

Sewell testified that Dowdy claimed that Smith had a gun, which suggested that he wanted

to claim self-defense.   (*Id.* at PageID 1055.)   The officers made no attempt to persuade Dowdy

that such a claim would be viable.   (*Id.* at PageID 1055–56.)   Ordinarily, a suspect can go in any

direction he wants "up to a point and then we would confront him . . . with some more evidence .

. . to see if his story wanted to change, which his did several time[s]."   (*Id.* at PageID 1056.)

While the officers are taking the typed statement, the suspect is free to revert back to an earlier

15

version of events because "[i]t's his statement.  It's the one that he's going to sign off on so everything has to be what he wants to say.  It has to be his words."  (*Id.*)   The officers did not attempt to bolster or add to Dowdy's story other than to confront him with information that they had obtained from other witnesses.   (*Id.* at PageID 1060.)

Dowdy testified that he was seventeen years old at the time of the shooting.   (*Id.* at PageID 1062.)   He acknowledged being interrogated by the two officers who testified, and stated that a sergeant came into the room and offered him something to drink.   (*Id.* at PageID 1063.)   The sergeant also told him that he needed to cooperate with the two officers who were interrogating him.   (*Id.* at PageID 1064.)    Dowdy claimed to have been arrested as a juvenile with no familiarity of *Miranda* rights.   (*Id.* at PageID 1063.)   He also testified that he did not understand or read the advice of rights form before he signed it and believed he was signing release papers.  (*Id.* at PageID 1064–65.)

According to Dowdy, he asked to speak to his mother and a lawyer during the investigation.  (*Id.*)   He said that he made his requests at the beginning of the interview, but he was told, "[Y]ou already grown."   (*Id.*)   He admitted that no threats were made during the interrogation.   (*Id.* at PageID 1066, 1076.)   However, he testified, that Quinn was playing the role of "bad cop," "slamming the table and all that," and saying, "I don't believe you, you need to tell me," (*Id.* at PageID 1066), while also taking credit for sending Dowdy's brother to prison.   (*Id.* at PageID 1066–67.)   As a result, Dowdy stated that he "was so afraid, [he] just wanted to make it out."   (*Id.* at PageID 1066.)   Dowdy testified that he told the officers what they wanted to hear because he believed that, by doing so, they would let him go home.   (*Id.* at PageID 1092–93.)

Dowdy recalled that the officers showed him photo lineups on which witnesses had circled his picture.   (*Id.* at PageID 1065–66, 1089–90.)   He characterized the gunshot residue test as "[s]ome type of trick they was playing on me."   (*Id.* at PageID 1068.)   He also testified that they

16

swabbed his mouth, but his lawyer later told him that the results were inconclusive because too much time had passed.   (*Id.*)   Dowdy testified that he filed a *pro se* motion to suppress, but his lawyer refused to pursue it.   (*Id.* at PageID 1069.)

Dowdy denied telling the officers that he shot at Smith in self-defense.   He testified that "I was like, I ain't shoot at nobody.   I just kept telling him I ain't shoot at nobody."   (*Id.* at PageID 1067.)   Dowdy told the police that he had fired a gun but did not shoot Smith.   (*Id.* at PageID 1074–75.)   He testified that "I was just saying anything.   I was under duress.   I just wanted to get out of there."   (*Id.* at PageID 1075.)   According to Dowdy, the officers did not tell him that he was giving a statement, although he admitted that the typist was taking down his statement but "[t]hat was, like, at the end."   (*Id.* at PageID 1077.)   He claimed, however, that "I never told them I shot at anybody."   (*Id.* at PageID 1078.)   If Dowdy told the officers that he shot at the car, "[t]hat was probably something I made up or something.   I don't recall."   (*Id.*)

Dowdy admitted that he was able to read and write and that he had initialed the pages of his statement, (*Id.* at PageID 1076), but testified that he did not read it because Sergeant Quinn told him the document was his release papers.   (*Id.* at PageID 1076–77.)   Dowdy insisted that he did not recall what he told the officers.   (*Id.* at PageID 1079.)   He explained that "I was just trying to make it out."   (*Id.*)   In response to whether it was his position that he did not remember what he told the officers or that he made up everything he had said, Dowdy replied, "it ain't a combination of both.   This is what I'm telling you.   I don't remember because it was so long ago."   (*Id.* at PageID 1080.)   At this point, the following exchange occurred:

> Q.   Okay.   So you just don't remember what you said to the officers. It may or may not have been true?
>
> A.   I just don't remember, ma'am.

(*Id.*; *see also id.* at PageID 1087 (Dowdy did not recall giving the statement to police, stating "I don't remember saying that at all.").)  He testified that the officers kept interrupting when the transcriptionist was typing his statement, telling him, "[N]ah, that ain't the truth, that ain't the truth.  And then that's when they kept on saying it so I was like all right."  (*Id.* at PageID 1093.)

Dowdy testified that he read over the statement after it had been taken.  (*Id.*)  He did not read the advice of rights form, but he did read his statement.  (*Id.* at PageID 1095.)  Yet, on recross-examination, he said that he did not read his typed statement: "I ain't look over it.  I just told you I was just signing after we was doing back and forth.  I ain't want to keep going back and forth with them."  (*Id.*)  Dowdy then testified that he read his statement months later.  (*Id.* at PageID 1096.)

Dowdy's trial counsel testified that he had been licensed to practice law for more than fifty-one years.  At the time of Dowdy's trial, his counsel had handled thousands of jury trials, including "[q]uite a few" first-degree-murder cases.  (*Id.* at PageID 1097.)

It was Dowdy's counsel's practice to discuss with defendants their statements and whether there were grounds for a motion to suppress.  (*Id.* at PageID 1099.)  If there had been grounds to suppress the statement, he would have filed a motion.  (*Id.* at 1100, 1101, 1124.)  He was present during Dowdy's post-conviction testimony, which did not change his mind about the strength of a suppression motion.  (*Id.* at PageID 1103.)  After reviewing his file, Dowdy's counsel later conceded that he had filed a motion to suppress as part of a discovery motion but apparently did not pursue it.  (*Id.* at PageID 1123–24.)  If he had thought the suppression issue was meritorious, Dowdy's counsel would have filed a standalone motion.  (*Id.* at PageID 1129–31.)  Counsel made a strategic decision to focus on the helpful parts of the statement, which allowed him to argue self-defense or, at worst, voluntary manslaughter.  (*Id.* at PageID 1174–75.)

Dowdy's counsel's theory at trial was that Dowdy did not shoot Smith. (*Id.* at PageID 1098–99.) He elaborated that there were at least sixty people present, the scene was chaotic, and two rival groups were engaged in a confrontation. (*Id.* at PageID 1099, 1100.) He noted that there was testimony that it was too dark to see properly. (*Id.* at PageID 1099.) He presented his case through cross-examination of the State's witnesses and presentation of witnesses who indicated that Dowdy was not the shooter. (*Id.*) The second prong of counsel's defense was that, if Dowdy did fire a gun, it was in self-defense. (*Id.* at PageID 1101.) Defense counsel planned to use the statement to support the self-defense argument. (*Id.* at PageID 1101, 1114.)

Dowdy's counsel's plan to rely on the good portions of the statement was hindered by Dowdy's decision to testify, which counsel had advised against. (*Id.* at PageID 1102.) He explained:

> That one, that the prosecution would tear him up [on] the witness stand on cross-examination. And there was some conflicts a little bit in his statement and what have you and it was [in] his best interest not to take the stand. And as I recall, I'm certain I put him on the stand and asked—we covered that point quite clearly, that the jury couldn't hold it against him if he didn't take the witness stand.

(*Id.*; *see also id.* at PageID 1102–03 (further explanation of his advice that Dowdy not testify).) Dowdy's counsel believed that "we had possibly [a] winnable case, that he could have been found not guilty if he didn't take the stand. (*Id.* at PageID 1112.) However, "[m]y evaluation after his testimony, he closed any doubt that the jury possibly could have." (*Id.*; *see also id.* at PageID 1178.) The trial judge pointed out that because Dowdy testified that he did not shoot Smith, Dowdy's defense attorney could not ethically embrace his statement. (*Id.* at PageID 1115–16.) Counsel believed that, if Dowdy did not testify, he could counter the portion of the statement in which Dowdy said he discharged a firearm with his witnesses who said that Dowdy did not have or fire a gun. (*Id.* at PageID 1118–19.) According to Dowdy's counsel, "I think really you've

got to have more than one strategy when you try a case as to what—hopes at least you'll convince a juror, one of them, to believe your client's side."   (*Id.* at PageID 1176.)

Post-conviction counsel conducted a lengthy and thorough cross-examination, emphasizing the inconsistencies between the two prongs of the strategy and the slim likelihood that Dowdy's trial counsel's strategy would be successful.   (*Id.* at PageID 1113–19, 1124–26, 1128–31.)   Dowdy's trial counsel testified that he did not seek a hearing on his motion to suppress because he did not believe the motion would succeed.   (*Id.* at PageID 1130.)

The post-conviction court denied relief on the merits, holding that, if a suppression motion had been filed, it would not have been granted.   (ECF No. 7-14 at PageID 1006–07.)   The post-conviction court reasoned that it credited the testimony of the officers, which it found to be credible.   (*Id.* at PageID 1006.)   The post-conviction court explained why it did not find Dowdy to be credible:

> [Dowdy's] testimony about the proceeding lacks credibility.   [Dowdy] repeatedly claimed that he did not know what he told the police and he just signed the paper without reading it.   [Dowdy] also claimed that he never was read his *Miranda* rights even though the record shows that he signed a waiver and then initialed the waiver on his statement.   [Dowdy] denied that the officers used physical threats to get him to give a statement; he just thought Sgt. Quinn was mean.   [Dowdy] alleges that the use of the GSR test was a trick to overcome his will and therefore his statement was involuntary.   [Dowdy] alleges that the test used was a ruse and not a real test.   From the testimony of the officers, it appears that the officers thought this was a valid test.   They testified that they believed the results showed [Dowdy] had fired a gun recently.   [Dowdy] has submitted no proof to show that the test performed was in fact a sham.

(*Id.* at PageID 1006–07.)   The post-conviction court concluded that, "[s]ince [Dowdy] has not shown that he would have prevailed on a motion to suppress he has shown no prejudice and this claim is without merit.   The Court will not second-guess a trial tactic and strategy unless those choices were uninformed because of inadequate preparation."   (*Id.* at PageID 1007.)

The post-conviction court also rejected Dowdy's claim that he was seventeen at the time of the events at issue, noting that Dowdy "has previously testified that he was 18 at the time of [the] homicide.   The Court does not find [Dowdy] credible when he has given two contradictory statements under oath."   (*Id.* at PageID 1009 (footnote omitted).)   Dowdy testified at trial that, when he was questioned by police, he had "just turned 18."   (ECF No. 7-7 at PageID 751.)

Dowdy raised this issue in his brief to the TCCA on the post-conviction appeal.   (ECF No. 7-17 at PageID 1211–14.)   The TCCA denied relief on the merits.   *Dowdy II*, 2020 WL 864168, at *7–8.)

Where, as here, a state prisoner's claim has been adjudicated on the merits in state court, a federal court can issue a writ only if the adjudication:

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).   The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential standard," which "demands that state-court decisions be given the benefit of the doubt."   *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted).   The deference to be accorded a state-court decision under *Strickland* is magnified when reviewing a claim of ineffective assistance of trial counsel under 28 U.S.C. § 2254(d):

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.   The standards created by *Strickland* and § 2254(d) are both "highly deferential," [*Strickland*, 466 U.S.] at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*], 556 U.S., [111,] 123 [(2009)].   The *Strickland* standard is a general one, so the range of reasonable applications is substantial.   556 U.S., at 123.   Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under

21

§ 2254(d).   When § 2254(d) applies, the question is not whether counsel's actions were reasonable.   The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105 (parallel citations omitted).

A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts."   *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).   "[A] run-of-the-mill state-court decision applying the correct legal rule . . . to the facts of a prisoner's case" does not "fit comfortably within § 2254(d)(1)'s 'contrary to' clause."   *Id.* at 406.   Here, the TCCA cited and applied the correct legal rule from *Strickland* and Tennessee cases applying *Strickland* and, therefore, the "contrary to" clause is inapplicable. *Dowdy II*, 2020 WL 864168, at *7–8.

An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case."   *Williams*, 529 U.S. at 413.   The state court's application of federal law must be "objectively unreasonable" for the writ to issue.   *Id.* at 409.   It is not sufficient that the habeas court, in its independent judgment, determines that the state court decision applied clearly established federal law erroneously or incorrectly.   *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citing *Williams*, 529 U.S. at 411).

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 103.

Dowdy presented no argument that the TCCA's resolution of claim 1(a) was objectively unreasonable.    In denying relief, the TCCA quoted at length the decision of the post-conviction court on this issue, *Dowdy II*, 2020 WL 864168, at *6, and concluded:

> The evidence presented in this case does not preponderate against the post-conviction court's findings.    The evidence presented was that Counsel formed a two-prong defense strategy, mistaken identification of the shooter and self-defense, and that he planned to present the self-defense theory if his mistaken identity theory was not borne out by the witnesses' testimony.    In the situation of presenting self-defense as his primary theory, parts of [Dowdy's] statement aided this theory and thus Counsel opted to keep the statement as part of the evidence, so he could use the helpful portions should this theory be presented.    The evidence established that Counsel's tactical decision was based on the facts and circumstances known to him. Such strategic or tactical decisions are given deference on appeal if the choices are informed and based upon adequate preparation. . . .    This court will not conclude, in hindsight, that other decisions should have been made.    [Dowdy] is not entitled to relief.

*Id.* at *8 (citations omitted).    "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ."    *Strickland*, 466 U.S. at 690. Dowdy does not argue that his trial counsel was unfamiliar with the relevant facts and the applicable law.    And even if it were assumed that Dowdy's counsel's performance was deficient, the Court agrees with the post-conviction court that a motion to suppress would not be successful. Therefore, Dowdy has not established prejudice.

Finally, Dowdy has not established that the TCCA's decision was based on an unreasonable factual finding.    "[W]hen a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, . . . [t]he prisoner bears the burden of rebutting the state court's factual findings 'by clear and convincing evidence.'"    *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting 28 U.S.C. § 2254(e)(1)).    A state court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion.    *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see also Rice v. Collins*, 546 U.S. 333, 341–42 (2006) ("Reasonable minds reviewing the record might disagree" about the factual finding

in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination.").  Dowdy has not addressed the TCCA's factual findings and, consequently, he has not demonstrated that any are objectively unreasonable.

Subclaim 1(a) is **DISMISSED**.

\* \* \* \*

Because every claim asserted by Dowdy is without merit, the Court **DENIES** the § 2254 Petition.   The § 2254 Petition is **DISMISSED WITH PREJUDICE**.   Judgment shall be entered for Respondent.

## III.   APPEAL ISSUES

Twenty-eight U.S.C. § 2253(a) requires the district court to evaluate the appealability of its decision denying a § 2254 petition and to issue a certificate of appealability ("COA") "only if the applicant has made a substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2); *see also* Fed. R. App. P. 22(b).   The COA must indicate the specific issue or issues that satisfy the required showing.   28 U.S.C. §§ 2253(c)(2) & (3).   No § 2254 petitioner may appeal without this certificate.   28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A "substantial showing" is made when the movant demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."   *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotation marks omitted).

> Where a district court has rejected a constitutional claim on the merits, the showing required to satisfy § 2253(c) is straightforward:   The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. . . .   When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. . . .

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).   "In short, a court should not grant a certificate without some substantial reason to think that the denial of relief might be incorrect."   *Moody v. United States*, 958 F.3d 485, 488 (6th Cir. 2020).   "To put it simply, a claim does not merit a certificate unless *every independent reason to deny the claim is reasonably debatable.*"   *Id.*; *see also id.* ("Again, a certificate is improper if *any* outcome-determinative issue is not reasonably debatable.").

In this case, the § 2254 Petition is meritless for the reasons previously stated.   Because any appeal by Petitioner on the issues raised in his § 2254 Petition does not deserve attention, the Court **DENIES** a COA.

Rule 24(a)(1) of the Federal Rules of Appellate Procedure provides that a party seeking pauper status on appeal must first file a motion and supporting affidavit in the district court. However, if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court.   *See* Fed. R. App. P. 24(a) (4)–(5).   In this case, for the same reasons the Court denies a COA, the Court determines that any appeal would not be taken in good faith.   It is therefore **CERTIFIED**, pursuant to Federal Rule of Appellate Procedure 24(a), that any appeal in this matter would not be taken in good faith.   Leave to appeal *in forma pauperis* is **DENIED**.[8]

**IT IS SO ORDERED**, this 31st day of March, 2024.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
CHIEF UNITED STATES DISTRICT JUDGE

---

[8] If Petitioner files a notice of appeal, he must pay the full $605 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within thirty days of the date of entry of this Order.   *See* Fed. R. App. P. 24(a)(5).